## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AIX SPECIALTY INSURANCE COMPANY | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  21-2338 |
| | : | |
| AMERICAN LEGION DEPARTMENT OF PENNSYLVANIA, *et al.* | : | |
| | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                **March 14, 2022**

Insurance companies and their lawyers carefully draft coverage and exclusions in their business liability policies and then require premium payments consistent with their perceived risk. We evaluate the insurer's coverage obligations by comparing the insurer's language in the four corners of the purchased insurance policy with the allegations in the four corners of the underlying complaint when the insured is sued for damages resulting from an occurrence arguably covered under the policy.

We today find a policy covers the American Legion Department of Pennsylvania for costs incurred defending itself against claims of negligence and negligent supervision after a drunk man entered one of its alcohol-serving posts with a gun—despite the post's employment of security guards—and then shot another patron in the post's bathroom. The injured patron is now suing the American Legion Department in state court. The policy's liquor liability exclusion does not apply to preclude defense coverage when the injured man suing in state court specifically seeks damages arising from negligent supervision and negligent security at the post.

Possibly mindful its policy may cover costs of defense, the insurer also asks us to reform the policy consistent with what it believes to be the parties' understanding the policy would not

cover occurrences at the Department's posts. The evidence is confusing, and the insurer does not meet its burden of clear, precise, and convincing evidence necessary for us to reform written contracts. The evidence is also not clear as to the insurer's claim to rescind the policy based upon the Department's alleged misrepresentation when obtaining the policy. We must evaluate the credibility of witnesses at trial to determine whether this policy must be reformed or rescinded.

## I.    Undisputed material facts

Congress created The American Legion to promote the civic welfare.[1] The American Legion comprises one master national organization (the "American Legion") with "Departments" in each state like the American Legion Department of Pennsylvania (the "Department") presently before us.[2] Each department in turn creates regional "posts."[3] The departments "serve as an intermediary" between the posts and the master organization.[4] The Department maintains about 700 posts in Pennsylvania.[5] Some of these local posts sell alcohol.[6] The Department owns The George H. Imhof Post No. 153 (the "Imhof Post") in South Philadelphia which sells alcohol.[7]

### *Shunnye Dunlap sues the Department after Crazy G shoots him at the Imhof Post.*

The Imhof Post's sale of alcohol to drunk persons and the supervision of its agents is now at issue in the Philadelphia Court of Common Pleas in a lawsuit filed by Shunnye Dunlap against the Imhof Post and the Department (the "Dunlap Litigation").[8] Our issue is whether the Department's insurer must continue to defend the Department in the Dunlap Litigation. We begin with the underlying conduct before turning to the insurance coverage language.

Mr. Dunlap began a night of partying at the Wheels of Soul clubhouse in West Philadelphia in January 2018.[9] He saw a person nicknamed "Crazy G" drinking "heavily" and exhibiting "signs of intoxication."[10] Mr. Dunlap's party moved to the Imhof Post.[11] Two security guards searched and wanded Mr. Dunlap for weapons before he entered the Imhof Post.[12] Crazy G had already arrived at the Imhof Post by the time Mr. Dunlap arrived.[13] Crazy G appeared "visibly intoxicated"

with slurred speech and bloodshot eyes.[14] Crazy G exhibited "unwanted and violent physical behavior," including "forcing other patrons off of barstools" and "pushing and shoving other customers."[15] Imhof Post employees witnessed Crazy G's drunken actions, yet served, and continued to serve, him alcohol.[16] At some point, Crazy G shot Mr. Dunlap in the head using a handgun while the two were in the Imhof Post bathroom.[17] The Imhof Post then allowed Crazy G to escape.[18] Mr. Dunlap underwent lifesaving surgery.[19] He survived but sustained "permanent and life threatening injuries."[20]

Mr. Dunlap brings two claims in state court against the Imhof Post; "American Legion Department of Pennsylvania, Inc."; The American Legion; Amboo, Inc., whose role is unclear from the underlying complaint; and John Does.[21] First, he sues for dram shop liability under Pennsylvania law.[22] Mr. Dunlap alleges the Imhof Post and the Department negligently sold Crazy G alcohol despite his obvious intoxication, which helped cause the bathroom shooting.[23] Second, Mr. Dunlap sues the Imhof Post and the Department for negligence and "negligent security."[24] He alleges the Imhof Post and the Department assumed a duty to protect their patrons from other patrons' violence, yet breached the duty by failing to implement proper security measures.[25] Mr. Dunlap specifically pleads the Imhof Post and Department "had a duty to provide security services for the premises, and to guard against and/or warn of dangerous or potentially dangerous conditions upon the premises and to remove and/or warn about unlawful occupants on the premises who were dangerous to Mr. Dunlap."[26] Mr. Dunlap alleges the Department bore both direct and vicarious liability for the incident at the Imhof Post.[27]

### *AIX agrees to provide property and business liability insurance to the Department.*

The Department sought costs of defense and indemnity from any judgment in the Dunlap Litigation from its insurer AIX Specialty Insurance Company under a businessowners insurance policy the Department purchased from AIX.[28]

3

AIX agreed to insure "American Legion Department of Pennsylvania."[29] AIX provided both property coverage and business liability coverage.[30] AIX agreed to provide property coverage for five buildings; neither AIX nor the Department identified the Imhof Post as one of those properties.[31] AIX also agreed to provide business liability coverage where it did not specify coverages for individual buildings, instead covering the Department generally for business liability.[32] AIX agreed to defend the Department against any "suit" seeking "damages because of 'bodily injury' . . . caused by an 'occurrence.'"[33] The parties defined "bodily injury" as "bodily injury, sickness or disease sustained by a person, including disability, shock, mental anguish, mental injury or death resulting from any of these at any time."[34] The parties defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[35]

AIX includes four exclusions from coverage material to our analysis today.

### 1. Liquor liability exclusion.

The policy on its face excludes business liability coverage for certain alcohol-related injuries under an exclusion titled "Liquor Liability Exclusion."[36] The policy excluded damages for "'[b]odily injury' . . . for which any insured may be held liable by reason of":

1. Causing or contributing to the intoxication of any person, including causing or contributing to the intoxication of any person because alcoholic beverages were permitted to be brought on your premises, for consumption on your premises;

2. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.[37]

The exclusion specifies it "applies even if the claims allege negligence or other wrongdoing in[] [t]he supervision, hiring, employment, training or monitoring of others by an insured"—but only if one of three triggering occurrences listed above caused the bodily injury.[38]

4

This liquor liability exclusion only applies to insureds who:

a.  Manufacture, sell or distribute alcoholic beverages;

b.  Serve or furnish alcoholic beverages for a charge whether or not such activity:
    (I) [r]equires a license; (II) [i]s for the purpose of financial gain or livelihood;

c.  Serve or furnish alcoholic beverages without a charge, if a license is required
    for such activity; or

d.  Permit any person to bring any alcoholic beverages on your premises, for
    consumption on your premises.[39]

The exclusion does not apply to bodily injury "arising out of":

a.  The selling, serving or furnishing of alcoholic beverages at the specific activity
    described in the Schedule; or

b.  Permitting any person to bring any alcoholic beverages on the premises
    described in the Schedule, for consumption on the premises described in the
    Schedule.[40]

The "Schedule" includes state and national conventions, conferences, and activities.[41] The Schedule does not include events occurring at the Department's posts such as The Imhof Post.[42]

### 2. Vicarious liability exclusion.

The policy's second relevant exclusion is titled "Vicarious Liability Exclusion."[43] It excludes coverage for "any damages as a result of 'bodily injury' . . . imputed to an insured by virtue of the named insured's status as the American Legion State Department as it relates to any local American Legion organization, unless, at the time of the occurrence, the insured has exercised 'dominion and control' over the local American Legion organization."[44] The parties agreed to define "dominion and control" as "the taking of possession of any local American Legion organization facility or retention of control over the implementation of any of the operational aspects of the local American Legion organization pursuant to the American Legion Bylaws."[45]

The vicarious liability exclusion itself contains an exception requiring AIX to defend the Department in suits alleging the Department's vicarious liability. It reads: "However, we will have

the right and duty to defend an insured against any 'suit' seeking" the damages otherwise excluded "as provided for under" the section of the policy providing AIX's payment obligations in suits it defends.[46]

### 3.  Expected or intended injury exclusion.

The policy contains a third relevant exclusion titled "Expected or Intended Injury."[47] It simply excludes coverage for "'[b]odily injury' . . . expected or intended from the standpoint of the insured."[48] The exclusion "does not apply to 'bodily injury' resulting from the use of reasonable force to protect persons or property."[49]

### 4.  Punitive damages exclusion.

The policy's fourth and final relevant exclusion is contained in an endorsement titled "Punitive Damages Exclusion."[50] It excludes coverage for: "Fines, penalties, punitive, exemplary, vindictive or other non-compensatory damages imposed upon the insured, or any multiplied portion of compensatory damages."[51]

***The parties dispute whether they intended to insure the Department for incidents arising at the Department's posts.***

The Department procured its policy through Lockton Affinity, a broker AIX authorized to issue AIX policies to the Department.[52] The parties dispute whether AIX and the Department intended for the policy to provide business liability coverage to the Department for incidents at its posts.

Lockton employee Nikki Pealer oversaw Lockton's relationship with the Department.[53] The Department procured its AIX insurance through Lockton.[54] AIX sent Lockton underwriting guidelines and authorized Lockton to approve applications for AIX insurance without AIX's input.[55] Ms. Pealer swore she did not know of specific requests from the Department to cover its

posts.[56] Ms. Pealer swore if Lockton knew the policy covered the posts, the policy's premium would have tripled because the policy did not account for post-related risks.[57]

But Ms. Pealer also ambiguously swore she knew of conversations "from Lockton with AIX" in which Lockton told AIX "the policy should provide defense but not indemnity" for incidents at posts.[58] AIX and Lockton discussed losses from post incidents for "years" before determining how to "ultimately respond."[59] Ms. Pealer swore "our intent was . . . there would be defense" of the Department under the policy, "and [the Department] would [be] dismissed from that claim or released from that lawsuit, and that the policy would not respond because there would be no liability on behalf of" the Department.[60]

Hanover Insurance acquired AIX and handles certain claims made on AIX insurance policies.[61] Hanover's case unit manager Joseph Fitzgerald oversaw the Department's claim for coverage in the Dunlap Litigation.[62] Manager Fitzgerald swore the policy's underwriters told him "they thought they were writing an account only for the [Department] and [its] premises . . . they did not think they were writing something that would have liability or potential liability for local chapters from across the state."[63]

Hanover's chief underwriting officer Stephanie Seibold swore the policy's vicarious liability exclusion showed "our intent to just cover the State Department's Office headquartered operations," not post operations.[64] She agreed the vicarious liability exclusion could provide a duty to defend certain claims depending on the claims' details, but "like[ly] not."[65] Chief Underwriter Seibold swore a later policy issued to the Department changed for the 2021–22 coverage period when AIX "added in some kind of belts and suspenders approach just to make sure that our intent was clear to any third party that our intent is not to cover any of the individual posts, but the headquarters location."[66] She swore, "AIX, Lockton, and the State Department all understood that

there was no coverage" for post incidents.[67] Chief Underwriter Seibold swore Lockton did not receive authority from AIX to issue policies covering Department liability arising from post incidents.[68]

Jon Mantha served as the Department's Comptroller and bore responsibility for procuring the Department's insurance through Lockton.[69] Comptroller Mantha swore neither he nor the Department specifically requested insurance from Lockton to cover the posts.[70] Comptroller Mantha applied for the policy in 2016.[71] Lockton in the 2016 application asked about the number of "club members," hours of operation, food sales, cooking equipment, and liquor sales.[72] Comptroller Mantha wrote in the margin next to these questions: "N/A. This is the State HQ for the American Legion[,] not a Post."[73] He swore he wrote "N/A" because he knew the Department and posts were "separate organizations."[74] He represented the "hours of operation" were 8:00 a.m. to 4:30 p.m., listed only thirty-five employees, and only five locations.[75] This represented accurate information for the Department, but not for the posts.[76] Comptroller Mantha marked the section inquiring about liquor sales as not applicable because he applied for the "State HQ[,] not a Post."[77] Comptroller Mantha swore he thought he applied for Department insurance, not post insurance.[78]

The Department's adjutant James Hogan swore the Department maintains no "operational control" over the posts.[79] The Department provided "mandated bylaws" to the posts and suspended the Imhof Post's charter, meaning it could no longer serve alcohol, after the Crazy G incident.[80] But the Department "never anticipated" being sued for incidents occurring at the posts.[81] The Department recently began requiring the posts to obtain their own insurance policies.[82]

### *AIX asks we declare its defense costs coverage obligations.*

AIX is now defending the Department in the Dunlap Litigation under a reservation of rights.[83] AIX asks us to declare it need not defend or indemnify the Department in the Dunlap Litigation.[84] AIX pleads: (1) we must rescind the policy because the Department made

misrepresentations to procure insurance for the posts; (2) alternatively, we must reform the policy to reflect the parties did not intend to insure the Department for post incidents; (3) alternatively, the policy does not cover the Department because Mr. Dunlap did not specifically name the Department in the Dunlap Litigation; (4) the policy does not provide coverage because Mr. Dunlap did not plead an "occurrence"; (5) the expected or intended injury exclusion bars coverage; (6) the liquor liability exclusion bars coverage; (7) the punitive damages exclusion bars coverage; and (8) the vicarious liability exclusion bars coverage.[85]

We dismissed AIX's claims regarding its indemnification obligations as unripe because the Dunlap Litigation is ongoing.[86] The Department impleaded Lockton arguing Lockton must indemnify the Department if we find AIX need not defend the Department.[87]

## II.    Analysis

AIX and the Department now cross-move for summary judgment.[88] AIX seeks summary judgment arguing: (1) it bears no duty to defend the Department in the Dunlap Litigation because the policy's liquor liability exclusion applies; (2) if the policy obligates AIX to defend the Department in the Dunlap Litigation, we must reform the policy to rectify the parties' mutual mistake because neither party intended the policy to cover the Department for post incidents; (3) alternatively, we should rescind the policy because the Department made material misrepresentations to procure it; and (4) AIX bears no duty to indemnify the Department for punitive damages in the Dunlap Litigation because the policy does not cover punitive damages.[89]

The Department cross-moves for summary judgment.[90] The Department seeks summary judgment on all eight of AIX's claims, arguing: (1) it made no misrepresentation to AIX because it communicated only with Lockton; (2) AIX made no mistake regarding its insurance of the posts;

(3) Mr. Dunlap's pleading of the wrong entity's name does not bar coverage because the state court can easily fix the issue; (4) the Dunlap Litigation concerns an "occurrence" because Crazy G's shooting of Mr. Dunlap constitutes an accident; (5) the intended or expected injury exclusion does not apply because Mr. Dunlap does not plead intentional harms, only negligence; (6) the liquor liability exclusion does not apply because the Department does not sell alcohol; (7) the punitive damages exclusion does not apply because Mr. Dunlap does not allege a basis for punitive damages against the Department; and (8) the vicarious liability exclusion does not apply because Mr. Dunlap alleges the Department is directly liable for Mr. Dunlap's harms.[91]

We begin with the fundamentals of coverage analysis. "Under Pennsylvania law, an insurer has a duty to defend if the complaint filed by the injured party potentially comes within the policy's coverage."[92] "An insurer must defend its insured until it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense."[93] The duty to defend "even extends to actions that are 'groundless, false, or fraudulent' as long as there exists the possibility that the allegations implicate coverage."[94] "[I]f a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim."[95]

The "four corners rule" governs whether a claim is covered.[96] The four corners rule requires us to "compar[e] the four corners of the insurance contract to the four corners of the [underlying] complaint."[97] "Under the four corners rule, a court in determining if there is coverage does not look outside the allegations of the underlying complaint or consider extrinsic evidence."[98] We view the allegations of the underlying action as true and liberally construe them in favor of the insured.[99]

Our coverage analysis entails three steps. First, the insured "has the initial burden of establishing coverage under the policy."[100] This burden "is light," as "Pennsylvania law imposes

on insurers a broad duty to defend lawsuits brought against those they insure."[101] Second, once the insured establishes the policy provides coverage, the burden shifts to the insurer to show policy exclusions nonetheless exclude coverage.[102] We must "construe the exclusions in favor of coverage."[103] Third—and only if applicable—we must determine whether any equitable circumstances create or bar coverage.[104]

We find the Department establishes coverage under the policy. We also find AIX fails to carry its burden to show policy exclusions apply. But we cannot grant summary judgment to either party in full because genuine disputes of material fact exist as to two issues. First, genuine disputes of material fact exist regarding whether the parties intended the policy to insure the Department for liability arising from incidents at posts. Second, genuine disputes of material fact exist regarding whether the Department misrepresented material facts in applying for the policy.

### A. We grant summary judgment to the Department on AIX's claims the underlying complaint does not name the Department and does not allege an "occurrence" because the Department establishes coverage.

We first examine whether the Department meets its burden to establish coverage under the policy's coverage provisions. AIX makes two arguments the underlying complaint in the Dunlap Litigation does not trigger coverage: (1) Mr. Dunlap sues "American Legion Department of Pennsylvania, Inc.," but the policy insures "American Legion Department of Pennsylvania" without an "Inc." designation; and (2) Mr. Dunlap does not plead an "occurrence," which the policy requires for coverage. The Department responds: (1) Mr. Dunlap may amend his underlying complaint to sue the proper party, and (2) Mr. Dunlap pleads an occurrence by pleading an accident. We find the Department meets its burden to establish coverage.

### 1. Mr. Dunlap alleges liability of the named insured.

The Department seeks summary judgment on AIX's claim it need not cover the Department because Mr. Dunlap's underlying complaint sues the wrong party. The Department argues we

should not preclude coverage based on this technical issue which Mr. Dunlap can easily fix through amendment. AIX responds factual disputes preclude summary judgment. We agree with the Department.

Mr. Dunlap alleges claims for which AIX must defend the Department despite technically stating the wrong name of the insured. The policy insures "American Legion Department of Pennsylvania," not "American Legion Department of Pennsylvania*, Inc.*," which Mr. Dunlap sues.[105] But Mr. Dunlap's complaint sufficiently details its allegations against the same entity AIX insures. Mr. Dunlap alleges "American Legion of Pennsylvania, Inc.," is a business entity which owns the Imhof Post. He also sues the Department's national entity and local post entity, making clear he intended to sue all three levels of The American Legion (national, state, and regional). The mere addition of an "Inc." to the properly named "American Legion Department of Pennsylvania" does not seriously suggest Mr. Dunlap intended to sue an entity other than the one AIX insures. We expect Mr. Dunlap can easily fix the naming issue in state court if amendment is needed.[106] Allowing AIX to escape its coverage obligations when the underlying complaint substantially alleges the Department's liability would impermissibly promote form over substance,[107] offend notions of judicial economy by awaiting Mr. Dunlap's amendment in the underlying action to proceed here,[108] and—most importantly—violate the "broad duty" of coverage Pennsylvania imposes upon insurers.[109]

AIX cites no support for its overly formalistic argument the complaint must precisely state the insured's name. And we find no support for it. Judge Robreno rejected a similar argument in *Home Insurance Co. v. Law Offices of Jonathan DeYoung, P.C.*[110] There, the insurer sought a declaration it did not need to defend its deceased insured in an underlying action because the underlying plaintiff failed to properly name the insured's estate.[111] Judge Robreno rejected the

insurer's argument it need not defend its insured based on this technicality because the underlying complaint, "although naming the wrong legal party," still notified the true insured "of the existence of a claim against it."[112] The same reasoning applies today: AIX and the Department both possess notice of Mr. Dunlap's claim, which substantially alleges liability against the Department.

AIX argues the name problem is a "trial issue" without explaining what a trial would accomplish.[113] AIX forgets the four corners of Mr. Dunlap's state-court complaint determine AIX's coverage obligations. We must not "look outside the allegations of the underlying complaint or consider extrinsic evidence" at a trial to determine AIX's duty to defend.[114] Under the four corners rule, Mr. Dunlap's complaint adequately alleges a covered claim by describing the Department and its negligence.

### 2.  Mr. Dunlap alleges an "occurrence."

The Department next seeks summary judgment on AIX's claim Mr. Dunlap does not plead an "occurrence." The Department argues Mr. Dunlap alleges the insured's negligence, which is an occurrence. AIX again responds this "is a trial issue." We agree with the Department.

The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[115] While "injuries caused by intentional conduct are not 'accidental,'" an insurer still must defend claims "that the intentional conduct of a third party was enabled by the negligence of the insured."[116] Mr. Dunlap alleges the Department and the Imhof Post negligently allowed Crazy G to shoot Mr. Dunlap in the Imhof Post's bathroom through their negligent security and negligent disregard of a known risk. This is an occurrence. AIX's argument this is a "trial issue" again disregards the four corners rule; we do not need a trial to interpret an insurance policy and a complaint. The Department meets its burden to establish coverage.

**B. We grant summary judgment to the Department on AIX's claims the policy exclusions preclude coverage because AIX does not carry its burden to show policy exclusions apply.**

As the Department meets its burden to establish coverage, we must examine AIX's argument four policy exclusions bar coverage: (1) the liquor liability exclusion, (2) the expected or intended injury exclusion, (3) the vicarious liability exclusion, and (4) the punitive damages exclusion. We find AIX fails to meet its burden to show any of these exclusions apply.

### 1. The liquor liability exclusion does not apply.

AIX argues the policy does not obligate AIX to defend the Department in the Dunlap Litigation because the policy's liquor liability exclusion bars coverage. We disagree.

The insurer must "demonstrate the unambiguous mandate of the liquor liability exclusion" to extinguish coverage obligations.[117] The four corners rule governs the liquor liability exclusion's application.[118] "In determining whether a liquor liability exclusion applies, the Court must look to the factual averments in the complaint and may not rely simply on the labels applied to those averments."[119] If the underlying complaint's claims are "inextricably intertwined with the negligent provision of alcohol," the liquor liability exclusion will bar coverage.[120] But if the underlying claims are "sufficiently independent of[] the provision of alcohol," the liquor liability exclusion will not apply.[121]

The liquor liability exclusion does not apply because one-half of Mr. Dunlap's state-court claims are based in negligence arising independently of the Imhof Post's sale of alcohol. The liquor liability provision here only excludes coverage for bodily injury from "causing or contributing" to a person's intoxication, for "furnishing" alcohol to someone under the influence of alcohol, or for violating laws relating to the sale of alcohol. Mr. Dunlap does allege the Imhof Post contributed to Crazy G's intoxication and violated Pennsylvania alcohol laws. But Mr. Dunlap also alleges theories of negligence arising independently of the Imhof Post's alcohol-related actions. For

example, Mr. Dunlap alleges the Imhof Post—and, co-extensively, the Department— assumed and breached a legal duty to provide security to its patrons and failed to warn Mr. Dunlap of dangerous conditions by permitting Crazy G to shoot Mr. Dunlap. The Imhof Post employed security guards who patted down and wanded entrants for weapons, yet allowed Crazy G to enter the bar with a gun. Mr. Dunlap alleges the Imhof Post should have employed better safeguards and security procedures, provided adequately trained personnel, and protected Mr. Dunlap from Crazy G's attack. Mr. Dunlap's negligence allegations exist independently of the Imhof Post's sale of alcohol to Crazy G. Mr. Dunlap alleges two independent theories of liability: (1) the Imhof Post acted negligently and violated Pennsylvania dram shop law by serving alcohol to an intoxicated person, and (2) the Imhof Post acted negligently because, ***regardless of its alcohol service***, it assumed and breached a legal duty to protect Mr. Dunlap from a shooting in its bathroom. Because this second claim in Mr. Dunlap's "multiclaim" lawsuit is "potentially covered," the liquor liability exclusion does not apply.[122]

The Pennsylvania Superior Court's en banc decision in *Penn-America Insurance Co. v. Peccadillos, Inc.* illustrates the point.[123] In *Peccadillos*, the Superior Court ordered an insurer to defend underlying claims—despite a liquor liability exclusion like this one—alleging a bar served alcohol to clearly intoxicated patrons, then let those patrons leave the bar, causing a fatal car crash.[124] The plaintiffs in the underlying action alleged the bar violated Pennsylvania dram shop law by serving alcohol to the drunk driver.[125] They also alleged the bar acted negligently by ejecting the drunk driver from the bar after he fought another patron despite knowing the patron would attempt to drive drunk.[126] The Superior Court found the liquor liability exclusion did not apply because the underlying plaintiffs alleged the bar breached "independent" duties to "control the conduct of third persons."[127] The court reasoned the underlying plaintiffs certainly alleged

liability from the bar's provision of alcohol, but also alleged a separate duty not to eject drunk patrons who had brawled in the bar, exhibited poor "impulse control," and "whose inability to control a deathly instrumentality like an automobile was readily apparent."[128] This second theory extinguished the liquor liability exclusion's application.

We recognize our Court of Appeals twice criticized *Peccadillos* in non-precedential opinions.[129] Our Court of Appeals reasoned the Pennsylvania Supreme Court would not follow *Peccadillos* because *Peccadillos* relied on "hypothetical[]" theories of liability "not actually pleaded," which violates the four corners rule.[130] Our Court of Appeals's reasoning does not vitiate the persuasiveness of *Peccadillos* for three reasons. First, our Court of Appeals's unpublished opinions "do[] not constitute binding precedent."[131] Second, our Court of Appeals's characterization of *Peccadillos* is not entirely complete. True, the Superior Court in *Peccadillos* did theorize "the plaintiffs could aver the same facts even had the [drunk drivers] merely entered Peccadillos[] drunk and engaged in the conduct that prompted their ejection, regardless of whether Peccadillos' provision of alcohol had actually contributed to the men's intoxication or prompted their behavior."[132] But this did not constitute the primary basis for the Superior Court's reasoning. The Superior Court primarily reasoned the underlying complaint ***actually pleaded*** a claim "not based on whether Peccadillos caused or contributed to [the ejected patron's] intoxication."[133] The court cited an allegation which "premise[d] liability on Peccadillos' ejection from its premises of two sorely intoxicated patrons, whose brawling in the bar had revealed their lack of impulse control, and whose inability to control a deadly instrumentality like an automobile was readily apparent."[134] Even without the Superior Court's theorizing as to what the underlying plaintiffs ***could*** have pleaded, the underlying plaintiffs ***did*** plead a theory of liability independent of the bar's alcohol provision. This reasoning is faithful to the four corners rule. Third, even if our Court of

Appeals's *Peccadillos* criticism bound us, it still would not show the liquor liability exclusion applies here because Mr. Dunlap pleads independent theories of liability far more clearly than the underlying plaintiffs in *Peccadillos*. The *Peccadillos* plaintiffs pleaded their independent theory of liability in only one paragraph, bound up in language about the patron's intoxication.[135] Mr. Dunlap, by contrast, pleads many ways in which the Imhof Post breached a duty to Mr. Dunlap totally independent of its alcohol sales.[136]

Chief Judge Simon in the Northern District of Indiana followed *Peccadillos* in finding a liquor liability exclusion did not apply when reviewing facts like the ones before us. In *Property-Owners Insurance Co. v. Virk Boyz Liquor Stores, LLC*, the plaintiff in the underlying action alleged a bar overserved him alcohol.[137] The plaintiff also alleged another bar patron and a bartender attacked him in a bar fight.[138] The underlying plaintiff alleged the bar negligently (1) failed to intervene, (2) hired the bartender, (3) failed to train the bartender, and (4) overserved alcohol.[139] The bar's insurer argued a liquor liability exclusion like the one before us precluded coverage.[140] Chief Judge Simon disagreed because the first three claims had "nothing to do with the sale of alcohol at all."[141] He reasoned the underlying plaintiff did allege one claim the bar overserved the plaintiff alcohol, but, "quite separate from serving alcohol," the plaintiff also alleged the bar failed to protect him from the bar fight.[142] "[E]ven if [plaintiff] was drunk," Chief Judge Simon concluded, "the cause of the injury would not be the alcohol, but the bar's failure to protect him or failure to train its staff."[143]

Chief Judge Simon's analysis in *Virk Boyz* applies to the facts presented today. Mr. Dunlap alleges Crazy G arrived drunk to the Imhof Post, then shot Mr. Dunlap. Mr. Dunlap alleges the Imhof Post negligently allowed this to happen by failing to protect Mr. Dunlap,[144] train its personnel,[145] and hire appropriate personnel[146]—the very same allegations triggering a duty to

defend before Chief Judge Simon. True, Mr. Dunlap also alleges a dram shop liability claim and frequently references the Imhof Post's alcohol sales. But our Court of Appeals recently affirmed we must focus on "whether *a* claim" is potentially covered, "not whether the ***most salient*** claim is potentially covered."[147] Mr. Dunlap claims liability independent of the Imhof Post's alcohol service. Mr. Dunlap squarely alleges he suffered harm because the Imhof Post failed to protect him and failed to train its staff—allegations having "nothing to do with the sale of alcohol."[148]

Mr. Dunlap's underlying allegations contrast with cases where judges apply liquor liability exclusions to multiclaim complaints. In *State Automobile Mutual Insurance Co. v. Lucchesi*, for example, the plaintiff in the underlying action alleged a bar served visibly intoxicated patrons, let one such patron leave drunkenly, and became liable when a car struck the drunk patron.[149] The underlying plaintiff alleged the bar negligently permitted the drunk patron to leave the premises, failed to administer programs designed to protect drunk patrons, and failed to ensure the patron left the bar with a competent individual.[150] Chief Judge Kane found the policy's liquor liability exclusion—like the one we presently analyze—barred coverage.[151] She reasoned the underlying plaintiff alleged only one theory for why the bar owed him a duty: It served him alcohol.[152] Chief Judge Kane compiled many cases handling similar facts and finding liquor liability exclusions applied to underlying complaints where the insureds' legal duties arose solely from their sales of alcohol.[153] She concluded the liquor liability exclusion applied to the entire underlying complaint because the "only basis" pleaded for the bar's duty "[was] as a result of having furnished [plaintiff] with alcohol while he was visibly intoxicated."[154]

The facts faced by Chief Judge Kane in *Lucchesi* contrast with Mr. Dunlap's allegations. Our review of the underlying complaint in *Lucchesi* confirms the underlying plaintiff pleaded negligence theories against the bar solely arising from its service of alcohol.[155] Mr. Dunlap claims

the Imhof Post owed and breached a duty irrespective of its alcohol sales to Crazy G by voluntarily providing security services, then allowing Crazy G to shoot Mr. Dunlap in the bathroom. The Pennsylvania Supreme Court recognizes a duty to protect a person from another person's criminal conduct may arise "where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage."[156] Mr. Dunlap squarely alleges the Imhof Post assumed a duty to keep its patrons safe by employing security personnel.[157] We must not examine whether this theory bears merit; even "groundless" claims trigger the duty to defend if coverage is "possib[le]."[158] Mr. Dunlap's pleading of this theory extinguishes the liquor liability exclusion's application.

AIX does little to meet its burden of showing the liquor liability exclusion's "unambiguous mandate."[159] It cites only one case addressing a liquor liability exclusion, but it is inapposite because it also involved an assault and battery exclusion. In *Great American E&S Insurance Co. v. John P. Cawley, Ltd.*, Judge DuBois found an insurer bore no duty to defend a bar in an underlying action alleging the bar failed to protect a patron from other patrons' drunken assault.[160] But unlike here, the policy contained an assault and battery exclusion excluding coverage for assault and/or battery claims "based on the alleged failure of the Insured to protect individuals" or "the negligent selection, training, employment, supervision or control of any individual."[161] Judge DuBois found the assault and battery exclusion ***and*** the liquor liability exclusion "exclude[d] coverage for claims arising out of assaults ***or*** out of the service of alcohol."[162] AIX cites no provision like the assault and battery exclusion reviewed by Judge DuBois in *John P. Cawley*. The liquor liability exclusion before us includes a provision excluding coverage for negligence in "supervision, hiring, employment, training or monitoring of others by an insured."[163] But this exclusion is triggered only if the occurrence causing bodily injury arose from the insured causing

19

or contributing to a person's intoxication, furnishing alcohol to an underage person, or violating laws regarding the sale of alcohol. Mr. Dunlap alleges a bodily injury caused independently of these triggering events. AIX's reliance upon the reasoning in *John P. Cawley* is inapposite. The liquor liability exclusion does not apply.[164]

### 2. The expected or intended injury exclusion does not apply.

We easily dispatch the other three exclusions AIX cites. AIX argues the expected or intended injury exclusion bars coverage. This exclusion applies to "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."[165] As we discussed in explaining how Mr. Dunlap pleads an "occurrence," Mr. Dunlap alleged Crazy G's shooting constituted an accident caused by the Imhof Post's and the Department's negligence. Mr. Dunlap does not allege anyone expected or intended Crazy G to shoot Mr. Dunlap in the post's bathroom; rather, Mr. Dunlap pleads the Imhof Post's and Department's negligence caused a shooting which they *should* have foreseen, but did not. The expected or intended injury exclusion does not apply.

### 3. The vicarious liability exclusion does not apply.

AIX argues the vicarious liability exclusion precludes coverage. The vicarious liability exclusion precludes coverage for "'bodily injury' . . . imputed to an insured by virtue of the named insured's status as the American Legion State Department as it relates to any local American Legion organization, unless, at the time of the occurrence, the insured has exercised 'dominion and control' over the local American Legion organization."[166] AIX's repeated misunderstanding of the four corners rule causes it to concede the vicarious liability exclusion does not apply. AIX argues Mr. Dunlap pleads *either* the Department is vicariously liable for the Imhof Post's activities, *or* the Department is "directly liable for the post's activities."[167] AIX is correct; Mr. Dunlap pleads both theories.[168] Mr. Dunlap's complaint thus creates the possibility the vicarious liability exclusion does not apply, so it does not apply under the four corners rule.

The vicarious liability exclusion does not apply for a second reason: the exclusion itself contains an exception requiring AIX to defend the Department against suits seeking to impute liability to the Department based on post incidents. AIX promised: "[W]e will have the right and duty to defend an insured against any 'suit' seeking" the damages otherwise excluded.[169] As AIX admits, Mr. Dunlap pleads both vicarious liability and direct liability theories against the Department. The vicarious liability theory triggers the exception within the exclusion.

### 4.   The issue of whether the punitive damages exclusion applies is unripe.

AIX asks us to declare it need not indemnify the Department for punitive damages based on the punitive damages exclusion. We decline to do so because the indemnity question is unripe.

The punitive damages exclusion excludes coverage for: "Fines, penalties, punitive, exemplary, vindictive or other non-compensatory damages imposed upon the insured, or any multiplied portion of compensatory damages."[170] The exclusion requires "damages" to be "imposed upon the insured" before we may consider its application. Such indemnity questions are unripe as we found in our July 29, 2021 Order.[171] We may only issue declaratory judgments regarding "actual controvers[ies]."[172] We may not decide unripe controversies.[173] Whether an insurer has a duty to indemnify is not ripe "until there is an actual need for indemnification, that is, until liability has been determined in the underlying action."[174] Whether the policy obligates AIX to indemnify the Department for punitive damages is unripe because liability has not been determined in the Dunlap Litigation.

### C.   Genuine disputes of material fact regarding the parties' intent to insure the Department for incidents at the Imhof Post and the Department's material misrepresentations preclude summary judgment on AIX's claims for reformation and rescission.

The AIX policy obligates AIX to defend the Department in the Dunlap Litigation. AIX does not meet its burden of showing applicable policy exclusions. But these decisions as a matter

of law do not warrant summary judgment in the Department's favor. Genuine disputes of material fact exist as to whether the policy reflects a mutual mistake of AIX and the Department regarding whether they intended to insure the Department for incidents arising at its posts. Genuine disputes of material fact also exist as to whether the Department misrepresented material facts to procure coverage.

    **1.   Genuine disputes of material fact exist as to whether the policy reflects a mutual mistake of AIX and the Department regarding whether they intended to insure the Department for incidents arising at its posts.**

AIX argues we must reform the policy to preclude it covering the Department in the Dunlap Litigation. AIX argues neither it nor the Department intended for the policy to cover the Department for incidents arising at its posts; they intended only to cover the Department for operations at its state headquarters. The Department responds the record shows AIX, acting through its agent Lockton, intended to insure the Department for post incidents.

We may reform a contract if it reflects the parties' "mutual mistake."[175] "A mutual mistake occurs when the written instrument fails to properly set forth the true agreement among the parties."[176] Both parties must have been "mistaken as to existing facts at the time of execution" of the contract.[177] The mutual mistake doctrine "will apply only where the mistake: (i) relates to the basis of the bargain; (ii) materially affects the parties' performance; and (iii) is not one as to which the injured party bears the risk."[178] Reformation is "sparingly granted," and the party seeking reformation must prove the mutual mistake "by clear, precise and convincing evidence."[179]

Genuine disputes of material fact exist as to whether the parties intended the policy to cover the Department for incidents occurring at the Imhof Post. The record contains substantial evidence neither the Department nor AIX intended to insure the Department for post-related occurrences.

As to the Department's intent, Comptroller Mantha, who bore responsibility for the Department's insurance needs, specified on the 2016 policy application he applied for the "State

HQ for the American Legion[,] not a Post." Comptroller Mantha only disclosed information about the Department, not information about the posts. He disclosed five locations, and the policy specified only five locations in its specifications for property insurance. Comptroller Mantha and the Department's Adjutant Hogan both swore the Department maintains minimal oversight of the posts' activities. These facts, among others, suggest the Department did not intend to procure post-related insurance.

But the record is confusing at best as to AIX's intent. Lockton's Ms. Pealer working on AIX's behalf swore Lockton would have written a policy with triple the premium had Lockton thought it insured the Department for post incidents. Her testimony is consistent with the testimony of Manager Fitzgerald and Chief Underwriter Seibold. Manager Fitzgerald swore underwriters did not write a policy insuring the Department for post incidents. And Chief Underwriter Seibold swore AIX did not intend to insure the Department for post incidents. Chief Underwriter Seibold further testified Lockton did not enjoy authority from AIX to issue AIX policies covering the posts. But other evidence muddies the waters. For example, Lockton's Ms. Pealer swore Lockton told AIX the policies "should provide defense" to the Department. She swore Lockton intended "there would be defense," the defense would cause the Department's dismissal from the underlying suits, and "the policy would not respond because" the Department would not face liability. This testimony comports with the language of the vicarious liability exclusion. The vicarious liability exclusion contains an exception specifically requiring AIX to defend suits alleging the Department bears vicarious liability for its posts' negligence.[180] This contradictory evidence creates genuine disputes of material fact regarding AIX's intent. Did AIX truly not intend to defend the Department for post incidents? Or did AIX simply realize a *post hoc* policy ambiguity?

AIX does not carry its burden to show by clear, precise, and convincing evidence the policy reflects the parties' mutual mistake.[181] Nor does the Department carry its burden to show no genuine disputes of material fact as to the parties' intent. We must weigh credibility of these limited witnesses to determine the parties' true intent.

### 2. Genuine disputes of material fact exist as to whether the Department misrepresented material facts.

AIX alternatively asks we declare the policy is void *ab initio* because the Department made a material misrepresentation to procure it. AIX does not carry its burden to show the Department made a misrepresentation. And the Department does not carry its burden to show it did *not* make a misrepresentation.

An insurer "may rescind a policy if (1) the application contained a misrepresentation, (2) the misrepresentation was material to the risk being insured, and (3) the insured knew that the representation was false when made, or the insured made the representation in bad faith."[182]

AIX fails at the first step because it does not cite a Department misrepresentation. AIX argues the Department completed the 2016 policy application in bad faith because the Department seeks coverage for risks it did not disclose. But we find nothing inaccurate on the 2016 application. Comptroller Mantha repeatedly and conspicuously confirmed he submitted the 2016 application for the "State HQ for the American Legion[,] not a post." Comptroller Mantha then disclosed accurate information about the Department. He omitted information specific to posts—like cooking equipment—only after conspicuously disclosing he did not apply for post insurance. Despite Comptroller Mantha's accurate representations, AIX issued a policy which did not exclude the posts from coverage. AIX fails to identify an inaccurate representation on the 2016 application.

The Department also fails to carry its summary judgment burden because it fails to show no factfinder could find a misrepresentation. The Department simply argues it made no

misrepresentation because it did not communicate directly with AIX to procure its policy and rather communicated with Lockton. But AIX authorized Lockton to write and issue policies on AIX's behalf to the Department, which suggests Lockton is AIX's agent for the purpose of issuing insurance policies to the Department.[183] The Department ignores agent-principal law. The Department would have us find an insured may misrepresent its insurance needs in applying for a policy, so long as the insured communicates only with an insurer's authorized broker. We reject this untenable proposition. As the Department makes no other argument regarding its misrepresentations, we are constrained to find it does not carry its burden to show its entitlement to summary judgment on AIX's rescission claim.

### III.      Conclusion

A man is suing the Pennsylvania Department of The American Legion after being shot by an allegedly drunk man in the bathroom of one of its alcohol-serving posts. The allegedly drunk man somehow brought a gun into the post even though the post hired security guards who searched patrons for guns upon arrival. The Department's insurer asks us to declare it need not defend the Department in this ongoing state-court litigation. We find the insurance policy obligates the insurer to pay the costs of defending the Department and the policy's exclusions do not apply. But these findings do not warrant a declaratory judgment in the Department's favor today. Genuine disputes of material fact exist as to whether we can reform the policy based on whether the insurer and the Department intended the policy to cover the insured for liabilities arising from incidents at its posts. Genuine disputes of material fact also exist as to whether the Department misrepresented material facts to procure coverage. We will resolve these issues after evaluating the credibility of contradictory testimony at trial.

---

[1] *See* 36 U.S.C. §§ 21701–02; *see also Dunlap v. Am. Legion*, No. 20-3771, 2020 WL 6146628, at *5 (E.D. Pa. Oct. 19, 2020) (explaining Congress created The American Legion).

[2] *See* ECF Doc. No. 43-2 ("App'x") at 699 (Hogan Dep. at 8:1–11); *see also Dunlap*, 2020 WL 6146628, at *5 (explaining structure of American Legion). We cite the parties' appendix using the Bates stamps at the bottom of each page.

[3] *Dunlap*, 2020 WL 6146628, at *5 (quoting *Urban v. Am. Legion Dep't*, 723 N.W.2d 1, 3 (Minn. 2006)); *see also* App'x at 428 (Pealer Dep. at 24:19–23) (describing American Legion's structure).

[4] *Dunlap*, 2020 WL 6146628, at *5 (quoting *Urban*, 723 N.W.2d at 6).

[5] App'x at 700 (Hogan Dep. at 9:10–16).

[6] ECF Doc. No. 1-2 ¶ 9.

[7] *Id.* ¶¶ 8–9.

[8] ECF Doc. No. 1-2 (*Shunnye Dunlap v. Am. Legion Post 153 Home Ass'n d/b/a; a/k/a George M. Imhof Post 153 of the Am. Legion of the State of Pa., et al.*, No. 2465 (Pa. Ct. Com. Pleas, Phila. Cnty. 2020)).

[9] *Id.* ¶ 12.

[10] *Id.*

[11] *Id.* ¶ 13.

[12] *Id.* ¶ 14.

[13] *Id.*

[14] *Id.* ¶¶ 15, 17.

[15] *Id.* ¶ 17.

[16] *Id.* ¶ 19.

[17] *Id.* ¶ 23.

[18] *Id.* ¶ 24.

[19] *Id.* ¶ 25.

[20] *Id.* ¶ 26.

[21] *Id.* at 4–5 (using the pagination supplied by the CM/ECF docketing system).

[22] *Id.* at 11–13.

[23] *Id.*

[24] *Id.* at 13–16.

[25] *Id.* ¶¶ 37–38.

[26] *Id.* ¶ 37.

[27] ECF Doc. No. 1-2 ¶ 11 (claiming vicarious liability); *id.* at 13–16 (claiming "Defendants" owed and breached duty).

[28] ECF Doc. No. 1 ¶ 37; *See* App'x at 242–390 (policy).

[29] App'x at 249.

[30] App'x at 253 (property coverage terms); App'x at 257 (business liability coverage terms).

[31] App'x at 253–56.

[32] App'x at 257.

[33] App'x at 302.

[34] App'x at 332 (policy endorsement modifying the policy's definition of "bodily injury").

[35] App'x at 316.

[36] App'x at 304 (listing policy exclusions); App'x at 377 (endorsement containing exclusion for "Liquor Liability").

[37] App'x at 377.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

---

[43] App'x at 938 (ECF Doc. No. 45-2).

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] App'x at 304.

[48] *Id.*

[49] *Id.*

[50] App'x at 321.

[51] *Id.*

[52] App'x at 432–33 (Pealer Dep. at 28:22–29:10).

[53] App'x at 417 (Pealer Dep. at 13:7–21). Joe Perkins primarily handled Lockton's communications with the Department regarding the relevant policy. App'x at 418–20 (Pealer Dep. at 14–16). Mr. Perkins passed away. App'x at 418 (Pealer Dep. at 14:14–21).

[54] App'x at 416 (Pealer Dep. at 12:10–16).

[55] App'x at 434 (Pealer Dep. at 30:2–9); App'x at 831 (Seibold Dep. at 15:10–16, 16:9–14).

[56] App'x at 464 (Pealer Dep. at 60:6–11).

[57] App'x at 455–56 (Pealer Dep. at 51:13–52:11); App'x at 457 (Pealer Dep. at 53:12–23).

[58] App'x at 452–53 (Pealer Dep. at 48:20–49:1).

[59] App'x at 450 (Pealer Dep. at 46:11–14).

[60] App'x at 451 (Pealer Dep. at 47:4–17).

[61] App'x at 822 (Seibold Dep. at 6:5–7); App'x at 771 (Fitzgerald Dep. at 7:3–8).

[62] App'x at 773 (Fitzgerald Dep. at 9:20–24).

[63] App'x at 805–06 (Fitzgerald Dep. at 41:18–42:10).

[64] App'x at 829–30 (Seibold Dep. at 13:15–16:1).

65 App'x at 830 (Seibold Dep. at 14:12–18).

66 App'x at 840–41 (Seibold Dep. at 24:20–25:4).

67 App'x at 842 (Seibold Dep. at 26:11–17).

68 App'x at 843 (Seibold Dep. at 27:3–7).

69 App'x at 616 (Mantha Dep. at 10:6–23).

70 App'x at 629 (Mantha Dep. at 23:1–6); App'x at 631 (Mantha Dep. at 25:1–7).

71 App'x at 631–32 (Mantha Dep. at 27:23–28:22); *see also* App'x at 602–05 (2016 application).

72 App'x at 602–05.

73 App'x at 603.

74 App'x at 673 (Mantha Dep. at 67:18–22).

75 App'x at 603.

76 App'x at 636 (Mantha Dep. at 30:6–17).

77 App'x at 605.

78 App'x at 631 (Mantha Dep. at 25:1–17).

79 App'x at 711 (Hogan Dep. at 20:10–16).

80 App'x at 712 (Hogan Dep. at 21:3–19); App'x at 714 (Hogan Dep. at 23:16–23).

81 App'x at 717 (Hogan Dep. at 26:11–16).

82 App'x at 729–30 (Hogan Dep. at 38:19–39:12).

83 ECF Doc. No. 1 ¶ 37.

84 *See generally* ECF Doc. No. 1.

85 *Id.* at 8–23.

86 *See* ECF Doc. No. 12; *see also State Farm Fire and Cas. Co. v. CM Vantage Specialty Ins. Co.*, No. 21-1616, 2022 WL 717257, at *4–6 (E.D. Pa. Mar. 10, 2022) (detailing why indemnification question is unripe where "the state court has yet to adjudicate liability in the Underlying Action").

[87] ECF Doc. No. 34.

[88] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party, there exists 'no genuine dispute as to any material fact' and the movant 'is entitled to judgment as a matter of law.'" *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021) (quoting *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 770 (3d Cir. 2018)). We do not weigh evidence or make credibility determinations. *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

"The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex*, 477 U.S. at 322–23).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

[89] ECF Doc. No. 43-3. AIX does not seek summary judgment on the other four theories it pleaded in its Complaint.

[90] ECF Doc. No. 42.

[91] ECF Doc. No. 45.

[92] *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005).

[93] *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673–74 (3d Cir. 2016).

---

[94] *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010); *see also Vitamin Energy, LLC v. Evanston Ins. Co.*, 22 F.4th 386, 392 (3d Cir. 2022) (quoting *Jerry's Sport*, 2 A.3d at 541) (providing same rule).

[95] *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999).

[96] *Ramara*, 814 F.3d at 673.

[97] *Vitamin Energy*, 22 F.4th at 392 (second alteration in original) (quoting *Erie Ins. Exch. v. Moore*, 228 A.3d 258, 265 (Pa. 2020)).

[98] *Ramara*, 814 F.3d at 673.

[99] *Id.* (quoting *Frog, Switch & Mfg Co.*, 193 F.3d at 746); *see also Vitamin Energy*, 22 F.4th at 392 (we must construe the underlying complaint "in favor of coverage").

[100] *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, 507 F. Supp. 3d 616, 621 (E.D. Pa. 2020).

[101] *Vitamin Energy*, 22 F.4th at 388.

[102] *Newchops*, 507 F. Supp. 3d at 621.

[103] *Vitamin Energy*, 22 F.4th at 394–95.

[104] *See, e.g.*, *A.P. Pino & Assocs., Inc. v. Utica Mut. Ins. Co.*, No. 11-3962, 2012 WL 2567093, at *4–7 (E.D. Pa. July 3, 2012) (analyzing whether the reasonable expectations doctrine, reformation, or bad faith created coverage where policy did not provide duty to defend).

[105] *Compare* App'x at 249 (policy naming "American Legion Department of Pennsylvania), *with* ECF Doc. No. 1-2 at 2 (Mr. Dunlap's complaint naming "American Legion Department of Pennsylvania, Inc.").

[106] *See* Pa. R.C.P. 1033(a) (permitting amendments to change the name of a party). AIX agreed the issue "may be 'fixable'" through amendment in the state-court proceeding. ECF Doc. No. 49-1 at 12.

[107] *See, e.g.*, *Midomo Co. v. Presbyterian Hous. Dev. Co.*, 739 A.2d 180, 184 (Pa. Super. Ct. 1999) ("[W]e will not exalt form over substance.").

[108] *See, e.g.*, *Husman v. Allstate Ins. Co.*, No. 06-1646, 2007 WL 712211, at *1 (W.D. Pa. Mar. 7, 2007) (refusing to require amendment to fix technically incorrect form of pleading punitive damages "in the interests of efficiency and judicial economy").

[109] *Vitamin Energy*, 22 F.4th at 388.

[110] 32 F. Supp. 2d 219 (E.D. Pa. 1998).

[111] *Id.* at 226.

[112] *Id.* at 227.

[113] ECF Doc. No. 49-1 at 12.

[114] *See Ramara*, 814 F.3d at 673.

[115] App'x at 316.

[116] *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 291 (Pa. 2007); *see also Nationwide Mut. Fire Ins. Co. of Columbus v. Pipher*, 140 F.3d 222, 225 (3d Cir. 1998).

[117] *Penn-Am. Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 267 (Pa. Super. Ct. 2011) (en banc).

[118] *Id.* at 265.

[119] *State Auto. Mut. Ins. Co. v. Lucchesi*, No. 11-0735, 2012 WL 2009355, at *5 (M.D. Pa. June 5, 2012) (citing *State Farm Fire & Cas. Co. v. Est. of Mehlman*, 589 F.3d 105, 116 (3d Cir. 2009)), *aff'd*, 563 F. App'x 186 (3d Cir. 2014).

[120] *Id.*

[121] *Id.*

[122] *Frog, Switch & Mfg. Co.*, 193 F.3d at 746.

[123] 27 A.3d 259.

[124] *Id.* at 262–63.

[125] *Id.* at 262.

[126] *Id.*

[127] *Id.* at 268.

[128] *Id.*

[129] *See Westport Ins. Corp. v. Hippo Fleming & Pertile L. Offs.*, 791 F. App'x 321, 324 n.3 (3d Cir. 2019); *Lucchesi*, 563 F. App'x at 191.

[130] *Westport*, 791 F. App'x at 324 n.3; *see also Lucchesi*, 563 F. App'x at 191 (same criticism).

[131] *Westport*, 791 F. App'x at 322 n.*.

[132] *Peccadillos*, 27 A.3d at 268.

[133] *Id.*

[134] *Id.*

[135] *Id.* at 263.

[136] *See* ECF Doc. No. 1-2 at 13–16.

[137] 219 F. Supp. 3d. 868, 871 (N.D. Ind. 2016).

[138] *Id.* In Indiana, unlike Pennsylvania, courts may consider extrinsic evidence to determine the duty to defend. *Id.* at 873 (citing *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1291 (Ind. 2006)). Chief Judge Simon considered extrinsic evidence, but this procedural difference does not distinguish his reasoning. *Id.*

[139] *Id* at 871.

[140] *Id.* at 872.

[141] *Id.* at 874.

[142] *Id.* at 875.

[143] *Id.*

[144] ECF Doc. No. 1-2 ¶ 41(n); (s).

[145] *Id.* ¶ 41(h).

[146] *Id.* ¶ 41(v–w).

[147] *Vitamin Energy*, 22 F.4th at 394 (first emphasis in original; second emphasis added).

[148] *Virk Boyz*, 219 F. Supp. 3d at 874.

[149] 2012 WL 2009355, at *1.

[150] *Id.*

[151] *Id.* at *4–6.

[152] *Id.* at *5.

153 *Id.* at *6 (compiling cases).

154 *Id.*; *see also Transp. Ins. Co. v. Heathland Hosp. Grp., LLC*, No. 15-4525, 2017 WL 5593363, at *10 (E.D. Pa. Nov. 20, 2017) (following *Lucchesi*'s reasoning where "all of" underlying complaint's claims were "inextricably intertwined with the duty . . . not to serve, sell or furnish alcohol beverages"), *aff'd*, 783 F. App'x 186; *Those Certain Underwriters & Insurers Subscribing to Lloyd's Pol'y No. SP93/7131 v. 6091 Frankford Ave., Inc.*, No. 96-4733, 1997 WL 22407, at *4 (E.D. Pa. Jan. 21, 1997) (same reasoning where "the only possible basis of the insureds' liability is as a business engaged in the sale of alcohol").

155 *See Lucchesi*, No. 11-735, ECF Doc. No. 4-5 at 12–23.

156 *Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984).

157 ECF Doc. No. 1-2 ¶ 38.

158 *Jerry's Sport Ctr.*, 2 A.3d at 541.

159 *Peccadillos*, 27 A.3d at 267.

160 866 F. Supp. 2d 437, 441–42 (E.D. Pa. 2011).

161 *Id.* at 440.

162 *Id.* at 441 (emphasis added).

163 App'x at 377.

164 The Department argues the liquor liability exclusion does not apply simply because the Department does not possess a liquor license, and the liquor liability exclusion contains an exception for insureds not possessing a liquor license. *See* ECF Doc. No. 48-2 at 6. The Department misses the point because Mr. Dunlap alleges the Department possesses a liquor license. *See* ECF Doc. No. 1-2 ¶ 10. This allegation controls our analysis under the four corners rule. Despite the Department's misplaced argument, we still find the liquor liability exclusion does not apply because AIX bears the burden to show its application.

165 App'x at 304.

166 App'x at 938.

167 ECF Doc. No. 49-1 at 17.

168 *See* ECF Doc. No. 1-2 ¶ 11 (claiming vicarious liability); *id.* at 13–16 (claiming "Defendants" owed and breached duty).

169 App'x at 938.

[170] App'x at 321.

[171] ECF Doc. No. 12.

[172] 28 U.S.C. § 2201(a).

[173] *See Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646 (3d Cir. 1990).

[174] *Republic Servs. of Pa., LLC v. Caribbean Operators, LLC*, 301 F. Supp. 3d 468, 474 (E.D. Pa. 2018) (citing *Knightbrook Ins. Co. v. DNA Ambulance, Inc.*, No. 13-2961, 2013 WL 12145016, at *6 (E.D. Pa. Oct. 2, 2013)).

[175] *See Zurich Am. Ins. Co. v. O'Hanlon*, 968 A.2d 765, 770 (Pa. Super. Ct. 2009).

[176] *Id.* at 771 (quoting *Daddona v. Thorpe*, 749 A.2d 475, 487 (Pa. Super. Ct. 2000)).

[177] *Id.* (quoting *Holmes v. Lankenau Hosp.*, 627 A.2d 763, 767–68 (Pa. Super. Ct. 1993)).

[178] *Consol. Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 96 (3d Cir. 1999) (citing *Lanci v. Metro. Ins. Co.*, 564 A.2d 972, 974 (Pa. Super. Ct. 1989)).

[179] *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F. Supp. 1147, 1149 (W.D. Pa. 1992), *aff'd*, 6 F.3d 780 (3d Cir. 1993).

[180] We note some concern regarding AIX's representations about the vicarious liability exclusion. AIX claims the vicarious liability exclusion barred coverage. AIX quoted the vicarious liability exclusion in its Complaint but omitted its language regarding AIX's duty to defend the Department in suits like the Dunlap Litigation. *See* ECF Doc. No. 1 ¶ 100. AIX then submitted a copy of the policy with its summary judgment briefing—but the policy does not contain the vicarious liability exclusion. *See* App'x 242–390. The policy contains one page notifying the Department: "The [f]ollowing [f]orm is [a]ttached to the Policy . . .: Vicarious Liability Exclusion." App'x at 262. But the "following" page does not contain the vicarious liability exclusion. *See id.* at 263. We do not know why the page is absent from the policy submitted to the Court. Chief Underwriter Seibold suggested at her deposition AIX maintains "some paper suppression efforts," so the vicarious liability exclusion "might not have been attached" to the policy. App'x at 844 (Seibold Dep. at 28:11–20). But the Department claimed in its summary judgment briefing AIX did not produce the vicarious liability exclusion during discovery. *See* ECF Doc. No. 45-2 at 15 ("[T]he copy of the policy that was provided in this litigation and that is referenced in AIX's Complaint and is in the Appendix of AIX does not include the entirety of the language of the vicarious liability exclusion."). The Department claims it did not receive the vicarious liability exclusion until Lockton produced it. *Id.* We are continuing to review potential liability arising from AIX's conduct which may necessitate fact-finding as to why it did not produce the vicarious liability exclusion during discovery and its compliance with professional obligations in the briefing to afford us a complete record.

---

[181] *Twin City*, 813 F. Supp. at 1149.

[182] *Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F. Supp. 353, 356 (E.D. Pa. 1997) (citing *N.Y. Life Ins. Co. v. Johnson*, 823 F.2d 279, 281 (3d Cir. 1991)).

[183] *See, e.g.*, *Luber v. Underwriters at Lloyd's*, No. 92-2200, 1992 WL 346467, at *3 (E.D. Pa. Nov. 16, 1992) ("[F]or a broker to be found to be an agent of the insurer, there must be some evidence of an authorization, or some fact from which a fair inference of an authorization by the company to the broker might be deduced."). We need not determine whether Lockton is indeed AIX's agent; it is sufficient to find the Department does not carry its burden to show Lockton is **not** AIX's agent.